```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED:   7/19/2016          │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

CYNTHIA VAUGHAN,                          :

                Petitioner,     :       **REPORT AND**
                                                  **RECOMMENDATION**
                                                  **TO THE HONORABLE**
     -against-                  :       **PAUL G. GARDEPHE**

UNITED STATES OF AMERICA,              :       10cr233-PGG
                                                  13cv1862-PGG-FM
              Respondent.     :

---------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

        <u>Pro se</u> petitioner Cynthia Vaughan ("Vaughan") brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2255 ("Section 2255") to vacate, set aside, or correct her sentence, following her plea of guilty, to a single count of bank fraud, in violation of 18 U.S.C. § 1344.  The charge arose out of Vaughan's scheme to defraud her employer, the Rockland Employees Credit Union ("Credit Union"), by having money transferred from the Credit Union's bank account to her personal account.  On September 8, 2011, Your Honor sentenced Vaughan to eighteen months of imprisonment and ordered her to pay $150,000 in restitution.

        In her motion, Vaughan alleges that she was denied the effective assistance of counsel in violation of the Sixth Amendment.  In particular, Vaughan argues that her retained trial counsel, David I. Goldstein, Esq., was ineffective because he (A) failed to present mitigating evidence to the prosecution, (B) failed to conduct a timely interview of a key witness, (C) was laboring under an actual conflict of interest, (D) coerced her into

accepting a plea agreement, (E) provided inadequate advice regarding whether to accept the plea agreement, and (F) failed to assist in the prosecution of her appeal.  (See Civ. ECF No. 1 ("Petition" or "Pet.") at 4-16).[1]

As set forth below, notwithstanding these claims, Vaughan's Petition should be denied.

I.     Relevant Facts and Procedural History

A.     Indictment

On March 18, 2010, a grand jury returned a three-count indictment charging Vaughan with bank fraud in violation of 18 U.S.C. § 1344.  (Cr. ECF No. 10).  Count One alleged that Vaughan had "money transferred from [Credit Union] operating accounts without authorization, into her own account and accounts under her control." (Id. at 1).  Counts Two and Three alleged, respectively, that Vaughan improperly "us[ed] [Credit Union] corporate credit cards to obtain goods and services for her own personal use" and "drafted two letters purporting to be from the Chairman of the Board of Directors of the [Credit Union] approving salary increases for herself."  (Id. at 2-3). During the period these acts were occurring, Vaughan was the chief executive officer of the Credit Union.  (S. 17).

---

[1]     "Cr. ECF No." refers to docket entries in 10cr233.  "Civ. ECF No." refers to docket entries in 13cv1862, the related civil proceeding.  "P." refers to the transcript of Vaughan's plea allocution.  (Civ. ECF No. 7 ("Resp't's Mem."), Ex. C).  "S." refers to the transcript of Vaughan's sentencing.  (Resp't's Mem., Ex. A).  "App. ECF No." refers to docket entries in Second Circuit case number 11cr3958, Vaughan's direct appeal.

B.    Guilty Plea, Sentencing, and Appeal

On May 12, 2011, Vaughan entered into a written plea agreement with the

Office of the United States Attorney for the Southern District of New York.  (See

Resp't's Mem, Ex. B ("Plea Agreement" or "Agreement")).  Pursuant to the Agreement,

which both Vaughan and Mr. Goldstein signed, the Government agreed to dismiss Counts

Two and Three of the indictment if Vaughan entered a pea of guilty to Count One.  (Id. at

1).  The parties further stipulated that Vaughan's United States Sentencing Guidelines

("Guidelines")[2] Offense Level ("GOL") was seventeen, her Criminal History Category

was Category I, and her Guidelines sentencing range therefore was twenty-four to thirty

months.  (Id. at 2-3).  The parties arrived at Vaughan's GOL based on (1) a ten-level

enhancement because the Credit Union's loss was between $120,000 and $200,000, (2) a

two-level enhancement "because [Vaughan] abused a position of public or private trust,"

and (3) a two-level reduction for Vaughan's "acceptance of responsibility."  (Id. at 2

(citing Guidelines §§ 2B1.1(b)(1)(F), 3B1.3, 3E1.1(a)).

In the Agreement, Vaughan also agreed that she would not appeal or

otherwise challenge a sentence that fell within or below the stipulated Guidelines

sentencing range, nor would she appeal any restitution amount of $150,000 or less.  (Id. at

4).  Vaughan further acknowledged that she was pleading guilty because she was, in fact,

guilty.  (Id.).

---

[2]    All citations to the Guidelines in this Report and Recommendation refer to the
Guidelines applicable at the time of sentencing.

That same day, Vaughan pleaded guilty before Magistrate Judge George A. Yanthis.  (See P. 1).  As part of that proceeding, Vaughan confirmed that she had been afforded sufficient time to discuss the Agreement with Mr. Goldstein and was satisfied with his services.  (Id. at 6-7, 9-10).  Vaughan also represented that no one had coerced her to plead guilty or made any promises to her apart from those set forth in the Agreement.  (Id. at 7, 17).  Vaughan then allocuted to her role in the crimes charged in Count One, explaining that she had transferred funds from the Credit Union's operating accounts into her own accounts and other accounts under her control, knowing that these transfers were unauthorized and "not legitimate."  (Id. at 18-19).  Vaughan further agreed that she was pleading guilty to Count One because she was, "in fact, guilty of the crime charged."  (Id. at 19).

At the conclusion of the proceeding, Judge Yanthis stated that he would report and recommend that Vaughan's guilty plea be accepted.  (Id. at 21).  Thereafter, on September 8, 2011, Your Honor accepted Vaughan's guilty plea, (Cr. ECF No. 52), and sentenced Vaughan to eighteen months of imprisonment, plus restitution in the amount of $150,000, (S. 26-27).

On September 15, 2011, Vaughan filed a pro se notice of appeal.  (Cr. ECF No. 59).  The Court of Appeals then appointed Randall Douglas Unger, Esq., as Vaughan's appellate counsel, but he filed an Anders brief on April 3, 2012.  (See App. ECF No. 30 at 14 (citing Anders v. California, 386 U.S. 738 (1967)).  Since Mr. Unger concluded that there were no non-frivolous issues to raise, on July 3, 2012, the

4

Government moved to dismiss Vaughan's appeal.  (See App. ECF No. 46).  The Second

Circuit granted the Government's motion by order dated January 14, 2013.  (See App.

ECF No. 61).  Thereafter, Vaughan was released from prison on February 21, 2013.[3]  See

https://www.bop.gov/inmateloc/ (last visited July 7, 2016).

      C.    Petitions

On August 3, 2012, Vaughan filed her first Section 2255 petition.

(12cv6129, ECF No. 1).  In a sua sponte order dated September 10, 2012, however, Your

Honor denied that petition without prejudice as premature, because Vaughan's direct

appeal remained pending.  (Id., ECF No. 4).

Following the dismissal of her appeal, Vaughan filed her present Petition on

March 19, 2013.  (Pet. at 1).  On June 24, 2013, the Government filed its opposition

papers, (Resp't's Mem.), and, on July 25, 2013, Vaughan filed her reply, (Cr. ECF No. 81

("Reply")).  The Petition consequently is fully submitted.

---

[3]    Although Vaughan has been released from prison, she still may proceed pursuant to Section 2255.  Vaughan was on supervised release when she filed her Petition, (see S. 26 (sentencing Vaughan to "18 months' imprisonment and three years of supervised release")), and "[t]he Second Circuit has held that a petitioner under supervised release may . . . be considered 'in custody' for habeas purposes," Wilson v. United States, No. 09 Cr. 1086 (DAB) (GWG), 2014 WL 748510, at *5 (S.D.N.Y. Feb. 26, 2014) (citing Scanio v. United States, 37 F.3d 858, 860 (2d Cir. 1994)).  Moreover, her claims are not moot because Vaughan may face "collateral consequences" as a result of her conviction, including the enhancement of future criminal sentences, and certain civil disabilities, such as being barred from holding certain offices, voting in state elections, and serving on a jury.  See United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999).

II.    Standard of Review

Vaughan seeks relief under Section 2255, the first sentence of which

provides:

> A prisoner in custody under sentence of a court established by
> Act of Congress claiming the right to be released upon the
> ground that the sentence was imposed in violation of the
> Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the
> sentence was in excess of the maximum authorized by law, or
> is otherwise subject to collateral attack, may move the court
> which imposed the sentence to vacate, set aside or correct the
> sentence.

28 U.S.C. § 2255.  Relief under this statute consequently may be based only on

"constitutional error . . . or an error of law or fact that constitutes a 'fundamental defect

which inherently results in a complete miscarriage of justice.'"  United States v. Bokun,

73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

Among the reasons for circumscribing relief in this fashion are "a respect for the finality

of criminal sentences, the efficient allocation of judicial resources, and an aversion to

retrying issues years after the underlying events took place."  Id.

III.   Discussion

A.    Waiver

As noted above, pursuant to her Plea Agreement, Vaughan waived certain

appellate rights.  More specifically, Vaughan agreed that she would "not file a direct

appeal; nor bring a collateral challenge . . . of any sentence within or below the Stipulated

Guidelines Range of 24 to 30 months' imprisonment" and "not . . . appeal any restitution

6

amount that is less than or equal to $150,000." (Agreement at 4). The Government

contends that Vaughan therefore has waived her right to file the Petition. (Resp't's Mem.

at 11-14).

   Courts in this Circuit have held that petitioners are foreclosed from

challenging guilty pleas entered pursuant to plea agreements when they have knowingly

and voluntarily relinquished the right to pursue such relief. See, e.g., United States v.

Monzon, 359 F.3d 110, 116 (2d Cir. 2004) ("Where the record clearly demonstrates that

the defendant's waiver of her right to appeal a sentence within an agreed Guidelines range

was knowing and voluntary, that waiver is enforceable."); Ayeni v. United States, No. 04

Civ. 6607 (DLC), 2004 WL 2238508, at *2 (S.D.N.Y. Oct. 4, 2004) (habeas petition

procedurally barred because petitioner knowingly and voluntarily waived his right to

pursue habeas relief. Such decisions recognize that permitting "a defendant to escape the

bargained-for consequences of her agreement with the Government would 'render the

plea bargaining process and the resulting agreement meaningless.'" Monzon, 359 F.3d at

117 (quoting United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir. 1993) (per

curiam)).

   Nonetheless, the Second Circuit has cautioned that waivers prohibiting a

petitioner from seeking appellate or habeas relief must be strictly construed against the

Government. See United States v. Tang, 214 F.3d 365, 368 (2d Cir. 2000). Thus, a

waiver that precludes a defendant from contesting only her sentence, as here, does not

foreclose her from contesting an unrelated aspect of her plea. United States v.

Hernandez, 242 F.3d 110, 113 (2d Cir. 2001) (per curiam) ("In this case, the defendant is not appealing any aspect of his sentence; he is appealing the denial of his motion to withdraw his guilty plea . . . .  Therefore, the plea agreement clearly does not bar this appeal.").   Moreover, when a defendant challenges the steps that preceded her waiver, that inquiry is not foreclosed, regardless of the waiver language.  See Frederick v. Warden, Lewisburg Correctional Facility, 308 F.3d 192, 195 (2d Cir. 2002) ("[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured.").

In her Petition, Vaughan complains of several alleged shortcomings on the part of Mr. Goldstein, her trial attorney.  Some of her contentions relate directly to the voluntariness of her guilty plea.  For example, Vaughan alleges that Mr. Goldstein was laboring under a conflict of interest, (Pet. at 7-10), coerced her into pleading guilty, (id. at 13-15), and provided inadequate advice to her regarding the proposed agreement, (id. at 10-15).  Each of these claims directly challenges whether Vaughan entered her guilty plea knowingly and voluntarily, and, therefore, Vaughan is not barred from challenging her conviction and sentence on these grounds by virtue of the waiver provision of the Plea Agreement.

Vaughan's remaining ineffectiveness claims are that Mr. Goldstein failed to present mitigating evidence to the prosecution in a timely manner, (id. at 4-5), conduct a timely interview of a key witness, (id. at 5-7, 11, 14-15), and assist in the prosecution of her appeal, (id. at 15-16).  All three of these claims in effect challenge Vaughan's

sentence, rather than the process by which the Plea Agreement was reached, or her decision to enter a guilty plea. They therefore are barred by an effective waiver. <u>See Parisi v. United States</u>, 529 F.3d 134, 138-39 (2d Cir. 2008) ("[Petitioner] would have this Court turn its gaze away from the plea process and toward the multitude of ways in which pre-plea events might reduce the strength of the defense and worsen the defendant's bargaining power vis-à-vis the prosecutor. We decline that invitation."); . <u>Garcia-Santos v. United States</u>, 273 F.3d 506, 509 (2d Cir. 2001) (holding that an effective waiver of the right to collaterally attack a conviction "applies to grounds that arise after, as well as before, . . . the waiver"). Moreover, to the extent these claims could be considered challenges to the restitution order, rather than Vaughan's sentence, "[t]he Second Circuit . . . has squarely held that challenges to restitution orders are not cognizable on a [Section 2255] motion." <u>Bimpeh v. United States</u>, No. 03 Cr. 206 (LBS), 2008 WL 4861705, at *1 (S.D.N.Y. Nov. 10, 2008) (citing <u>Kaminski v. United States</u>, 339 F.3d 84, 85 n.1, 89 (2d Cir. 2003)).[4]

---

[4]      During the plea allocution, Judge Yanthis asked the prosecutor to explain any appeal waiver provisions in the Agreement. The prosecutor proceeded to list those waivers but neglected to note that Vaughan had waived her right to attack her sentence collaterally. (<u>See</u> P. 10-11 ("As set forth at page four of the agreement, the defendant agrees not to <u>appeal</u> any sentence within or below the stipulated guidelines range.") (emphasis added)). Vaughan, however, does not argue that she failed to understand the consequences of signing this additional waiver provision. Moreover, Vaughan stated during the plea allocution that Mr. Goldstein had read and explained the terms of the Plea Agreement to her. (<u>See</u> <u>id.</u> at 6). Accordingly, this minor error does not provide a basis to conclude that Vaughan's waiver was not knowingly made. <u>Garcia-Santos</u> , 273 F.3d at 508 (finding a waiver knowing, in part, because petitioner "(1) . . . signed the plea agreement, (2) . . . stated to the magistrate judge that he had read and understood the plea agreement, . . . [and (3)] . . . did not claim, in his [Section 2255] motion, that he had not understood the waiver contained in his plea agreement . . . .").

The Court consequently could consider the merits of only some of Vaughan's claims in this proceeding.  Nevertheless, because a reviewing court might conceivable reach a different conclusion regarding the issue of waiver, I will address each of Vaughan's ineffective assistance claims in the order in which she raises them.[5]

B.     Ineffective Assistance of Counsel

To prevail on any ineffective assistance of counsel claim, a petitioner must demonstrate that (1) her counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694.  With respect to the first of these requirements, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." Id. at 689.  This deference is due because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 702 (2002).  Therefore, a petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted).  In the context of a guilty plea, a court analyzing the second prong must determine whether, but for counsel's errors, the defendant "'would not

---

[5]     In that regard, it perhaps bears mentions that Judge Cogan of the Eastern District of New York has concluded, based on his review of Second Circuit precedent, that "virtually all ineffective assistance claims [are able] to survive waivers procured through plea agreements." See Cross v. Perez, 823 F. Supp. 2d 142, 152 (E.D.N.Y. 2011).

have pleaded guilty and would have insisted on going to trial.'"  Hernandez, 242 F.3d at

112 (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

Although the Strickland test has two prongs, a court considering an

ineffective assistance claim need not "address both components of the [Strickland]

inquiry if the [petitioner] makes an insufficient showing on one."  Strickland, 466 U.S. at

697.  Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, . . . that course should be followed."  Id.

1.    Failure to Present Mitigating Evidence

Vaughan first contends that Mr. Goldstein rendered ineffective assistance

by failing to present mitigating evidence to the prosecutor, Assistant United States

Attorney Douglas Benjamin Bloom, Esq. ("AUSA Bloom").  Specifically, Vaughan

contends that she hired a forensic accountant, and that she and the accountant furnished

Mr. Goldstein with "substantial mitigating evidence on [all] counts of the instant

indictment."  (Pet. at 5-6).  Vaughan maintains that, "to [her] knowledge," Mr. Goldstein,

nevertheless, failed to timely provide this evidence to the prosecution.  (Id. at 6).

Suffice it to say, Vaughan has not explained how she possibly could know

what mitigating evidence was – or was not – presented to the Government.  Moreover,

Vaughan's claims are refuted by both Mr. Goldstein and AUSA Bloom.  Mr. Goldstein,

for example, has attested that he had "numerous conversations" with AUSA Bloom

"regarding mitigation, all in an effort to reach a possible resolution of this matter."  (Civ.

ECF No. 9 (Aff. of David I. Goldstein, Esq., sworn to on June 20, 2013 ("Goldstein

11

Aff.")), ¶ 8).  Similarly, AUSA Bloom has confirmed that Mr. Goldstein "repeatedly

presented to the Government evidence that some of the money that Vaughan

misappropriated from the [C]redit [U]nion was for purchases made . . . on behalf of the

[C]redit [U]nion."  (Civ. ECF No. 8 (Decl. of Douglas Benjamin Bloom, Esq., dated June

24, 2013), ¶ 2).  This presumably is the mitigating evidence that Vaughan contends was

improperly withheld.  (See, e.g., Pet., Ex. B).  Since both of the persons who would have

had personal knowledge concerning the nature and scope of Mr. Goldstein's efforts to

present mitigation evidence to the prosecutor have submitted sworn statements indicating

that he did so, Vaughan's conclusory assertions to the contrary obviously are not enough

to overcome the "strong presumption" that Mr. Goldstein acted properly.

       In any event, even if Vaughan could establish that Mr. Goldstein failed to

present certain mitigating evidence to AUSA Bloom, she has failed to show that she was

prejudiced as a result.  At the outset, there is no reason to believe that the Government

would have credited any of the additional mitigating evidence that Vaughan contends

should have been presented.  Nor is there any suggestion that the Government would have

changed its prosecutorial position based on such evidence.  As the Government correctly

observes, at best the mitigating evidence showed that Vaughan spent some money from

her personal account on Credit Union business.  But even if Vaughan had successfully

presented that evidence at trial, "she would still be guilty of [bank fraud]."  (Resp't's

Mem. at 19).  As a consequence, Vaughan has not established a reasonable probability

that the outcome of her case would have been different had Mr. Goldstein presented the Government with the mitigating evidence that she contends he failed to adduce.

### 2.   Failure to Timely Conduct a Witness Interview

Vaughan next contends that Mr. Goldstein rendered ineffective assistance by failing to interview a "key witness," Collin Morris ("Morris"), in a timely manner. (Pet. at 6; Reply at 6).  Morris was a "vendor of computer equipment and services who did business with the [Credit Union]."  (Pet. at 6).  Vaughan maintains that she told Mr. Goldstein "early in the investigative phase" of the case that Morris could provide exculpatory evidence.  (Id.).  According to Vaughan, Morris would have been able to testify that a $1,245 purchase made by her was a legitimate business expense.  (See Goldstein Aff. ¶ 3; Pet. at 6; Reply at 6, 9).  Since the Government alleged that she had misappropriated approximately $150,000 ("$150,000 Loss Amount"), such a minor adjustment would, of course, have done little to undermine the Government's case.

Mr. Goldstein first interviewed Morris five days prior to trial.  (Pet. at 6). According to Mr. Goldstein, following the interview and discussions with AUSA Bloom, it became clear that Morris was prepared to testify that the invoice reflecting the $1,245 purchase, rather than being genuine, was an "altered document," not prepared by him, and that Vaughan had previously contacted him "to change his testimony," i.e., lie to the Court.  (Goldstein Aff. ¶ 4).  Mr. Goldstein concluded that Morris' actual testimony would prove "devastating" to the defense and, shortly thereafter, began negotiating the Plea Agreement.  (Id.; Pet. at 10).

13

Vaughan now contends that had Mr. Goldstein interviewed Morris earlier, he would have learned that Morris' testimony was potentially damning and could have attempted to secure a plea agreement at an earlier stage in the proceedings.  (Pet. at 11). This, in turn, would have allowed Vaughan to receive an extra one-level reduction to her GOL for entering a timely plea of guilty.  (Id. (citing Guidelines § 3E1.1 (providing for a one-level reduction when a defendant "timely notif[ies] authorities of [her] intention to enter a plea of guilty"))).

Although Mr. Goldstein admits that he did not speak with Morris until "shortly before trial," (Goldstein Aff. ¶ 4), his failure to do so at an earlier date seems well within the bounds of reasonable advocacy.  Indeed, Morris was a minor witness who could at best have testified that one purchase, representing less than one percent of the $150,000 Loss Amount, was legitimate.  It was only after Mr. Goldstein learned that Morris had been asked by Vaughan to give false exculpatory testimony that his importance became clear.  That Mr. Goldstein lacked the foresight to anticipate that a minor defense witness would actually turn out to be a key prosecution witness does not amount to a constitutional error – if it was error at all.  Consequently, Vaughan has failed to establish that Mr. Goldstein was ineffective for failing to interview Morris at an earlier date.  Indeed, it takes considerable temerity for her to suggest that Mr. Goldstein could have secured a better plea deal had he discovered her attempt to suborn perjury at an earlier time.

14

### 3.    Conflict of Interest

Vaughan next argues that Mr. Goldstein had a conflict of interest that arose after she failed to pay all of the additional sums required by the terms of his retainer agreement.  (Pet. at 7-10).  As set forth below, even if Vaughan were able to establish that a conflict thus existed, she has not shown that the conflict influenced Mr. Goldstein's advocacy.  She therefore is not entitled to relief on this ground.

Under the Sixth Amendment, a criminal defendant's right to effective assistance of counsel includes "the right to representation by conflict-free counsel." United States v. Schwarz, 283 F.3d 76, 90 (2d Cir. 2002) (quoting United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998)).  When a petitioner is able to show that her counsel "labored under an actual conflict of interest" and that the conflict "adversely affected [her lawyer's] performance," prejudice under the second prong of the Strickland test is presumed.  Nix v. Whiteside, 475 U.S. 157, 187 (1986) (internal quotation marks and ellipses omitted) (quoting Strickland, 466 U.S. at 692); accord Eisemann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005).  Such an actual conflict exists when an attorney's personal interests diverge from those of his client "with respect to a material factual or legal issue or to a course of action."  LoCascio v. United States, 395 F.3d 51, 56 (2d Cir. 2005) (quoting Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993)).  To establish that the conflict adversely affected counsel's performance, a petitioner must show both that there existed a "plausible alternative defense strategy [which was] not taken up by counsel," and that counsel's decision not to pursue the alternative strategy was due to this conflict.

15

LoCascio, 395 F.3d at 56-57 (internal quotation marks omitted) (quoting United States v. Moree, 220 F.3d 65, 69 (2d Cir. 2000)).

Vaughan argues that her failure to pay all of the fees that Mr. Goldstein expected gave rise to an actual conflict of interest because he was then reticent to "go the distance" despite agreeing that Vaughan "had a good case." (Pet. at 7-9). As evidence of this alleged conflict, Vaughan notes that Mr. Goldstein sought leave to withdraw as counsel once further payments from her were not forthcoming. (See id. at 8; see also Cr. ECF No. 27 (Order dated April 5, 2011) (referring to an undocketed letter that presumably was submitted ex parte)). Your Honor denied that request on April 11, 2011. (See Cr. ECF No. 73 at 3). In Vaughan's view, around that time, Mr. Goldstein's work product took a decided turn for the worse.[6] Additionally, Mr. Goldstein then allegedly pushed her to accept the Plea Agreement rather than go to trial. (Pet. at 9).

Even if the Court were to assume that Mr. Goldstein was laboring under an "actual conflict of interest" and that trying the case was a "plausible alternative defense strategy," Vaughan has not shown that Mr. Goldstein's recommendation to accept the proposed plea agreement arose out of this conflict. Quite to the contrary, the record establishes that he was prepared for trial. As the Government correctly observes, (Resp't's Mem. at 20), following the denial of the withdrawal request, Mr. Goldstein filed

---

[6]       According to Vaughan, following Mr. Goldstein's unsuccessful request to withdraw, he (a) made "multiple errors in document filing," (Pet. at 8), (b) failed to provide "case law in support of [his] proposed verdict sheet[]," as required by Your Honor, (id. at 8-9), and (c) failed to accompany her during a presentencing interview with a probation officer, (Reply at 7).

16

a motion in limine, opposed the Government's motion in limine, and filed other required

pretrial documents, such as proposed voir dire questions.  (See Cr. ECF Nos. 38-41, 44).[7]

Moreover, Mr. Goldstein actively participated in a lengthy pretrial conference

approximately one week prior to trial, in which he argued the motions in limine and noted

that he had prepared approximately 300 exhibits for trial.  (See ECF No. 75 at 46-49).

        Mr. Goldstein maintains that, despite this level of pretrial preparation, he

advised Vaughan to accept the Plea Agreement after learning that Morris was prepared to

testify for the Government.  (See Goldstein Aff. ¶¶ 3-6).  Indeed, Vaughan concedes that

Mr. Goldstein conveyed this reasoning to her.  (Pet. at 10 (acknowledging that Mr.

Goldstein told her, "you do not want to go to trial because your witness is now a witness

for the [G]overnment")).  Vaughan suggests, however, that Mr. Goldstein's reason for

recommending a plea was pretextual because her case was otherwise "strong," and she

had four other witnesses who had signed affidavits and would testify in her favor.  (Id.;

Reply at 6).  Tellingly, however, she has not included in her papers the affidavits that

these additional witnesses allegedly signed.  In any event, Morris' testimony clearly

would have been a substantial blow to Vaughan's case.  Not only would Morris'

testimony, if credited, have established that Vaughan created a false invoice to cover her

unauthorized purchases, it also would have shown that she attempted to influence a

---

        [7]        The motion in limine and supporting documents that Mr. Goldstein filed were
originally filed incorrectly.  (See Cr. ECF Nos. 30-32).  These filing errors are among the
mistakes that Vaughan cites as examples of Mr. Goldstein's lack of attention after the denial of
his request to withdraw as counsel.  Suffice it to say, many attorneys encounter problems with
electronic filing, which is not a reflection on their level of zealousness.

witness' testimony.  This inevitably would have undermined other elements of Vaughan's case, including the testimony of other witnesses who allegedly were prepared to testify on her behalf.

In these circumstances, Vaughan cannot show, as she must, that Mr. Goldstein's advice not to proceed to trial arose out of an actual conflict of interest rather that the strength of the Government's case.  The alleged actual conflict of interest consequently is not a basis for granting her relief.

4.    Coercion

Vaughan next argues that Mr. Goldstein coerced her into entering a guilty plea.  The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  North Carolina v. Alford, 400 U.S. 25, 31 (1970).  "When evaluating the voluntariness of a guilty plea, a habeas court must examine the totality of the circumstances surrounding that plea."  Joseph v. Fischer, No. 02 Civ. 4809 (NRB), 2003 WL 68032, at *5 (S.D.N.Y. Jan. 7, 2003) (citing Henderson v. Morgan, 426 U.S. 637, 644-45 (1976)).

Vaughan maintains that the plea negotiations were "rushed."  (Pet. at 13).  According to Vaughan, after Mr. Goldstein spoke with Morris on May 11, 2011, he asked that she meet with him the following morning, which was the Friday prior to the start of trial.  (Id.).  During that meeting, after noting his conversation with Morris, Mr. Goldstein recommended that Vaughan consider a plea agreement, allegedly suggesting that "he

18

could get [her] probation."  (Id.).  Later the same day, however, Mr. Goldstein

recommended that Vaughan accept the far less favorable terms of the Plea Agreement.

Vaughan alleges that Mr. Goldstein then said she only had four minutes to decide whether

to accept the Agreement because AUSA Bloom was about to enter a conference.  (Id. at

12, 14).  Vaughan contends that she initially said no, but later "felt she had to say yes."

(Reply at 4).  Finally, Vaughan maintains that Mr. Goldstein told her she had to enter her

plea that very day, despite her having asked to have the weekend to consider the

Agreement.[8]  (Pet. at 14).

   Vaughan's assertions that she was not given enough time to consider her

options and improperly was pressured into pleading guilty are belied by the statements

that she made to Judge Yanthis under oath during her plea.  At that time, Vaughan

admitted that she had "transferred funds from [the Credit Union] . . . without

authorization into [her] own accounts" and was "pleading guilty . . . because [she was], in

fact, guilty of the crime charged."  (P. 18-19).  Significantly, Vaughan also stated that no

one had "threatened," "coerced," or "put any pressure on" her to plead guilty and she had

been afforded "enough time to discuss [the Agreement] with [Mr. Goldstein]."  (Id. at 6,

17).  Such statements during a plea allocution "carry a strong presumption of verity."

Blackledge v. Allison, 431 U.S. 63, 74 (1977); accord United States v. Juncal, 245 F.3d

166, 171 (2d Cir. 2001) (testimony at allocution carries a "strong presumption of

---

  [8] Mr. Goldstein, for his part, contests Vaughan's version of the events, stating that
Vaughan "was not given four minutes to make up her mind[.]  [Vaughan] was advised . . . of the
plea offer, and [she] agreed to [accept it]."  (Goldstein Aff. ¶ 7).

accuracy," which allows a court to discredit later self-serving statements, "absent a

substantial reason to find otherwise"); Adames v. United States, 171 F.3d 728, 732 (2d

Cir. 1999) (statements at a defendant's guilty plea allocution "are generally treated as

conclusive in the face of the defendant's later attempt to contradict them").

        To be sure, Vaughan faced a difficult choice.  After at least part of her

defense fell apart, the Government apparently offered her an opportunity to plead guilty

to only one of the three counts against her provided she did so that same day.  (See

Goldstein Aff. ¶ 7).  Her only alternative was to proceed to trial on all three counts the

following Monday.  (Id.).  Faced with these alternatives, Vaughan followed the advice of

her counsel and opted to plead guilty.  The fact that she would have preferred to have the

weekend to consider her options, (see Pet. at 14), does not mean that her plea was

coerced, see, e.g., Awan v. United States, No. 09 Civ. 0356 (JS), 2012 WL 2579170, at

*1 (E.D.N.Y. June 28, 2012) (quoting United States v. Kaczynski, 239 F.3d 1108, 1115-

16 (9th Cir. 2001)) (forcing a defendant to "choose between unpleasant alternatives is not

unconstitutional"); United States v. Beltran-Moreno, No. 05 Cr. 546 (PHX) (NVW), 2011

WL 6780842, at *9 (D. Ariz. Aug. 5, 2011) ("Nor is coercion shown from the mere fact

that Movant was between a rock and a hard place, where he did not wish to proceed to

trial and did not wish to plead guilty."); United States v. Hardimon, No. 10 Cr. 30170

(MJR), 2011 WL 925859, at *5 (S.D. Ill. Mar. 15, 2011), aff'd, 700 F.3d 940 (7th Cir.

2012) ("[T]here is nothing unseemly about setting a deadline to accept a plea offer."); see

also United States v. Basu, 531 F. Supp. 2d 48, 53 (D.D.C. 2008), aff'd, 358 F. App'x

187 (D.C. Cir. 2009) (noting movant's lack of "legal support for the proposition that the presence of a deadline after which a plea offer will expire converts an otherwise valid guilty plea into an involuntary one").  Particularly in light of Vaughan's statements during her guilty plea, there is no basis for concluding that Vaughan was coerced into accepting the Agreement.

          5.    <u>Inadequate Plea Advice</u>

       Vaughan further contends that Mr. Goldstein provided inadequate advice regarding the desirability of accepting the Plea Agreement.

       In this Circuit, a defense lawyer must always communicate the terms of a plea offer to a defendant.  <u>See</u> <u>Pham v. United States</u>, 317 F.3d 178, 182 (2d Cir. 2003); <u>Cullen v. United States</u>, 194 F.3d 401, 404 (2d Cir. 1999).  Defense counsel also must discuss with their clients the pros and cons of pleading guilty.  <u>See</u> <u>Purdy v. United States</u>, 208 F.3d 41, 45-46 (2d Cir. 1998).  However, "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because . . . '[t]here are countless ways to provide effective assistance in any given case.'"  <u>Id.</u> at 45 (internal citations omitted, some alterations in original) (quoting <u>Strickland</u>, 466 U.S. at 693).

       Vaughan claims that Mr. Goldstein's advocacy was deficient because he recommended that she accept a plea agreement with unfavorable terms.  (Pet. at 9-10).  In this regard, Vaughan notes that her Guidelines sentencing range was largely tied to the $150,000 Loss Amount stipulated to in the Agreement, (<u>id.</u> at 9), which resulted in a ten-

21

level enhancement of her GOL, (Agreement at 2 (citing Guidelines § 2B1.1(b)(1)(F)).

Vaughan contends that no reasonable attorney would have advised her to stipulate to the

$150,000 Loss Amount, as the Presentence Report ("PSR") prepared by the Probation

Department alleges only that she stole "$65,000" from the Credit Union in connection

with Count One of the indictment.  (Pet. at 9).

        As the Government correctly observes, (Resp't's Mem. at 24), under the

Guidelines, the loss amount may include losses attributable to non-charged conduct, so

long as it is part of the "same course of conduct or common scheme or plan," Guidelines

§§ 1B1.3(a)(1)(A), (a)(2), 1B1.3 (note 3), 3D1.2(d); see also United States v. Bove, 155

F.3d 44, 47-48 (2d Cir. 1998) ("Guidelines § 1B1.3(a)(1)(A)['s] . . . broadly inclusive

language clearly encompasses both charged and non-charged conduct.").  Counts Two

and Three of the indictment clearly alleged acts that were part of the "same course of

conduct or common scheme or plan."  See Guidelines § 1B1.3(a)(2).[9]  Moreover, the

$150,000 Loss Amount represents approximately what the Government believed it could

prove at trial with respect to all three counts of the indictment.  (See App. ECF No. 35

(PSR), ¶¶ 10, 13 15 (noting that the losses to the Credit Union attributable to the account

transfers under Count One were "at least $65,000," that the losses attributable to the

unauthorized credit card transactions were "at least $71,200," and that the total loss "in

---

[9]      Under the Guidelines, charges are part of a "common scheme or plan" when they
are "substantially connected to each other by at least one common factor, such as common
victims, common accomplices, common purpose, or similar modus operandi."  Id. § 1B1.3 (note
nine).  Here, all three counts share at least two common factors – they had a common purpose,
defrauding the Credit Union, and involved the same victim.

the scheme was in excess of $150,000")).[10]  In light of these calculations, it plainly was not improper for Mr. Goldstein to advise Vaughan to accept the Plea Agreement, which stipulated to the total loss amount attributable to all three counts of the indictment.  This is particularly true because Mr. Goldstein reasonably may have believed that Vaughan would be convicted of all three counts if the case were to be tried.

In an effort to avoid this conclusion, Vaughan argues that even if all three counts were considered, the proposed plea deal was only marginally better than her worst case scenario at trial, and that she had a "significant amount of mitigating evidence." (Pet. at 9-10, 12).  Vaughan further suggests that Mr. Goldstein should have sought an "evidentiary hearing" to determine the loss amount before advising her to accept the Plea Agreement.  (Id. at 12).  Neither of these contentions withstands scrutiny.

At the outset, an evidentiary hearing as part of a guilty plea was not a viable option.  Indeed, Vaughan herself acknowledges that Goldstein told her that AUSA Bloom would "not agree to an evidentiary hearing unless there was a trial."  (Id.).

Furthermore, had she gone to trial, Vaughan would have lost the benefit of the two-level GOL reduction for having entered a guilty plea.  She also potentially would

---

[10]     The PSR was filed under seal.  I have forwarded a copy of the PSR to Your Honor's Chambers.

have faced a two-level enhancement for obstructing or impeding the administration of

justice based on Morris' testimony.[11]  See Guidelines § 3C1.1.  With the four-level

increase in her GOL, the Government would only have needed to prove that Vaughan

misappropriated $30,001 from the Credit Union for the GOL stipulated in the Agreement

to apply to the calculation of her sentence.  See id. § 2B1.1(b)(1) (providing a six-level

enhancement for any loss more than $30,000).  Had the Government established that she

misappropriated more that $70,001, Vaughan would have faced an even higher GOL.  Id.

And, if the Government proved that she stole more than $120,000, her Guidelines range

would have been thirty-seven to forty-six months, rather than twenty-four to thirty

months.  Id.; United States Sentencing Commission, Sentencing Table,

http://www.ussc.gov/guidelines/2015-guidelines-manual/archive/2011-5asentab (last

visited July 22, 2016).  Given this reality, it was eminently reasonable for Mr. Goldstein

to recommend – and forcefully argue in favor of – a guilty plea without putting the

Government to the test through an evidentiary hearing.

There consequently is no basis for Vaughan's claim that Mr. Goldstein's

advice concerning the Plea Agreement rendered him ineffective.

---

[11]      The Government argues that if Vaughan had been convicted on Count Two of the
indictment (relating to her use of the Credit Union's credit cards), she also would have been
subject to a two-level enhancement of her GOL for "fraud involving the use of an authentication
[feature]."  (Resp't's Mem. at 23 (citing Guidelines § 2B1.1(b)([10])).  There would have been
no basis for this enhancement, however.  See 18 U.S.C. §§ 1028(d)(1), (6) (defining an
authentication feature as a "means of identification to determine if [a] document is counterfeit"
"used by [an] issuing authority."  Issuing authority, in turn, is defined as a "government entity or
agency").

6. <u>Failure to Assist in an Appeal</u>

The only other alleged error by Mr. Goldstein relates to his failure to file a notice of, or assist Vaughan in connection with, her appeal. (Pet. at 15-16). Assuming Vaughan made a request for assistance (as she claims) and that Mr. Goldstein's failure to respond constituted a departure from proper practice, Vaughan still would not be entitled to any relief since she suffered no prejudice. Despite the lack of any assistance by Mr. Goldstein, Vaughan was able to file a timely notice of appeal and thereafter had the benefit of counsel appointed by the Second Circuit. (<u>See</u> Cr. ECF No. 59; App. ECF No. 30). That appointed attorney, however, filed an <u>Anders</u> brief in which he concluded that Vaughan had no non-frivolous issues to raise on appeal. (App. ECF No. 30). Given that conclusion, and the Second Circuit's subsequent dismissal of her appeal, (App. ECF No. 61), Vaughan cannot show that she was prejudiced by anything that Mr. Goldstein failed to do in connection with her appeal. She therefore has not satisfied the second prong of <u>Strickland</u> with respect to this final claim.

IV. <u>Conclusion</u>

For the reasons set forth above, Vaughan's habeas petition should be denied.

V. <u>Notice of Procedure for Filing Objections to this Report and Recommendation</u>

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a) and (e). Any

25

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of Judge Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

SO ORDERED.

Dated:         New York, New York
               July 19, 2016

_____
            FRANK MAAS
   United States Magistrate Judge

Copies to:

Cynthia Vaughan (via U.S. mail)
15 Nicole Way
Chestnut Ridge, New York 10977

AUSA Douglas Benjamin Bloom (via ECF)

26